NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney General
Head of the Criminal Division
MATTHEW A. LAMBERTI
Senior Counsel
MICHAEL CHRISTIN
Trial Attorney
Computer Crime and Intellectual Property Section
United States Department of Justice
1301 New York Avenue, NW, Suite 600
Washington, DC 20530
Tel.: 202-514-1026
matthew.lamberti@usdoj.gov
michael.christin@usdoj.gov

JASON M. FRIERSON
United States Attorney
JESSICA OLIVA
Assistant United States Attorney
Office of the United States Attorney
501 South Las Vegas Blvd., Suite 1100
Las Vegas, Nevada 89101
Tel.: 702-388-6336
jessica.oliva@usdoj.gov
*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff,<br>　　v.<br>YOANY VAILLANT,<br>　　a/k/a Yoany Vaillant Fajardo,<br>　　　　Defendant. | Case No. 2:22-cr-30-RFB-DJA<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL** |

CERTIFICATION: This response is timely filed in accordance with LCR 12-1.

　　Defendant Yoany Vaillant moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. ECF 650. The defendant makes two arguments. First, he claims that the United States did not present sufficient evidence to convict him. Def.'s

Motion, at 5-7.  Second, he asserts that the jury instruction on deliberate ignorance became "objectionable" when the Court declined to allow the defense to argue that co-defendant Kristopher Dallmann "mistreated, abused, and stole[] from [the defendant] while he worked at Jetflicks."  *Id.* at 7-8.  The defendant's arguments are wholly meritless, and the Court should summarily reject them.

**I.    Procedural History**

From November 4, 2024 to November 14, 2024, the Court conducted an eight-day jury trial against the defendant in connection with his significant role helping build Jetflicks, an online streaming service that amassed an enormous catalog of pirated television shows—bigger than Netflix, Hulu, or any other licensed streaming service—and made those works available for streaming and, at times, downloading to tens of thousands of paid subscribers around the United States.

On November 12, 2024, after the government rested its case in chief, the defendant made an oral motion for a judgment of acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure.  ECF 631, at 97-100.  The Court denied the motion.  *Id.* at 106-107.

On November 13, 2024, after the defense rested its case in chief, the defendant renewed his oral motion for a Rule 29 judgment of acquittal.  ECF 635, at 123-24.  The Court denied the motion.  *Id.* at 124.

On November 14, 2024, the jury returned a guilty verdict against the defendant for conspiracy to commit criminal copyright infringement, in violation of 18 U.S.C. § 371, 17 U.S.C. § 506(a)(1)(A), and 18 U.S.C. § 2319(b)(1).  ECF 637, at 3-5; ECF 638 and 641.

On November 27, 2024, the defendant filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  ECF 650.

## II. Legal Standard

A Rule 33 motion "should be granted *only in exceptional cases* in which the evidence preponderates highly against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (citation omitted, emphasis added). The defendant bears the "high" burden of showing that "a serious miscarriage of justice may have occurred." *See United States v. Lowe*, No. 2:14-CR-0004-JAD-VCF, 2015 WL 2168852, at *2 (D. Nev. May 8, 2015) (Dorsey, J.), *aff'd*, 676 F. App'x 728 (9th Cir. 2017) (cautioning that the court "can only set aside the verdict if [it] conclude[s] that the evidence preponderates sufficiently heavy against the verdict that a serious miscarriage of justice may have occurred") (internal quotations and citation omitted); *see also United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989) (noting standard and affirming denial of Rule 33 motion).

## III. Argument

The defendant's arguments misstate the record, ignore the evidence presented against him, and lack any persuasive legal authority. He fails to meet his burden of showing that a serious miscarriage of justice may have occurred. The Court should deny the defendant's motion for a new trial.

### A. Sufficient Evidence Existed For The Jury To Convict The Defendant

While the United States presented overwhelming proof at trial of the defendant's guilt, the defendant claims without any basis in his motion that "[t]he government never proved their case..." Def.'s Motion, at 6.

At trial, the defendant faced one count of conspiracy to commit criminal copyright infringement. To narrow the issues for the jury and shorten and simplify the trial, the parties stipulated to a number of facts. ECF 635, at 93-94. For example, the parties agreed that "based on the evidence and exhibits provided in this case that beginning in or around

2

2007 and ending in or around November 2017, ... Dallmann and others at Jetflicks were involved in a conspiracy to engage in criminal copyright infringement. The parties also stipulate and agree that this conspiracy involved 10 or more copies of copyrighted works, that the copies were reproduced during a 180-day period, and that the retail value of the copies of these works was more than $2,500. However, the parties have not stipulated to and dispute whether [the defendant] was a part of this conspiracy as defined by the [jury] instructions." *Id.* In other words, the defendant stipulated to all the facts necessary to convict him other than those involving knowledge and intent.

As a result, the trial focused in particular on three issues: (1) whether the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; (2) whether there was an agreement to willfully infringe on copyright on works involved in the conspiracy; and (3) whether he acted for purposes of commercial advantage or private financial gain. With regard to the first issue, once the government establishes that a conspiracy exists, evidence of only a slight connection to the conspiracy is necessary to convict a defendant of knowing participation in it. *United States v. Taylor*, 802 F.2d 1108, 1116 (9th Cir. 1986). Moreover, "[t]he government need not show direct contact or explicit agreement between the defendants." *United States v. Kostoff*, 585 F.2d 378, 380 (9th Cir. 1978). Rather, "[i]t is sufficient to show that [the] defendant knew or had reason to know of the scope of the conspiracy and that each defendant had reason to believe that [his] own benefits were dependent upon the success of the entire venture." *Id.*; *see also United States v. Shayota*, 784 Fed.Appx. 986, 991 (9th Cir. 2019) (holding that defendant's extensive involvement in company, handling of invoices and spreadsheets, and suspicious timing of financial transfer supported inference that she was trading in counterfeit goods and demonstrated her consciousness of guilt); *United States v. Moreland*, 622 F.3d 1147, 1169 (9th

3

Cir. 2010) (holding that defendant who worked with others to promote their fraud and hide ill-gotten money knew of conspiracy and agreed to conspiracy's objectives); *United States v. Laykin*, 886 F.2d. 1534, 1540 (9th Cir. 1989) (holding that defendant's "intimate participation in the details of the activity affords a reasonable basis for the jury's conclusion that he was a knowing participant"); *United States v. Arbelaez*, 719 F.2d. 1453, 1459 (9th Cir. 1983) (holding that defendants, who knew of each other's participation in the illegal enterprise and benefitted from it, knowingly participated in conspiracy). With regard to the second issue, the government need only show an agreement to reproduce copyrighted works without authorization from the copyright owners and that the defendant acted willfully in doing so, that is, the defendant knew he was acting unlawfully in some way. *United States v. Anderson*, 741 F.3d 938, 946 (9th Cir. 2013); *United States v. Liu*, 731 F.3d 982, 989-90 (9th Cir. 2013). Intent may be inferred from objective facts and the actions of the defendant. *Gallion v. United States*, 386 F.2d 255, 257 (9th Cir. 1967). And the law makes no distinction between direct and circumstantial evidence but simply requires that the jury be satisfied beyond a reasonable doubt from all the evidence in the case. *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969). Moreover, acting with willful blindness can also satisfy the willfulness standard. *Anderson*, 741 F.3d at 948. With regard to the third issue, the government can show, for example, that the defendant acted to make money. *United States v. Steele*, 785 F.2d 743, 749 (9th Cir. 1986). Ultimately, at this trial, the United States did all this, and the jury found the defendant guilty of conspiracy to commit criminal copyright infringement.

      The government put on six witnesses and introduced 116 exhibits into evidence. ECF 642 and 643. That proof overwhelmingly proved the defendant's guilt. First, the defendant's resume at the time he started work as Jetflicks' chief computer programmer

showed that he had 15 years of computer programming experience, started coding at age 12, taught at a university when he was the equivalent of a freshman in high school, and knew 27 computer languages. GX 69. The resume also indicated that the defendant had 6.5 years of experience as a computer programmer with companies in England and Spain before joining Jetflicks.

Second, the defendant and Dallmann exchanged 7,718 text messages over the course of almost 4.5 months, describing in detail their work on the Jetflicks' criminal streaming operation. GX 1601. Those messages show that the defendant began programming for Jetflicks literally hours after being hired; learned the whole illegal process from Dallmann days after starting; was working "all the time" at Jetflicks and claimed to love his job; and had a desk at Jetflicks where he could work. GX 68, 76, 74, 77, 79, 86, 1007, 1008, and 1610. In fact, these text messages show the defendant reviewing and working on piracy scripts; accessing SickRage and Jetflicks' servers and fixing issues with SickRage and the Jetflicks operation; receiving the SickRage and SABnzbd Application Programming Interface ("API") keys; telling Dallmann about the SickRage API and SickRage; and using SickRage to download television episodes. GX 1601. For example, on August 15, 2016—literally days after starting work at Jetflicks—he instructed Dallmann to go "in the sickrage page" and "change the password on all sickrage server and give me the new password  need the password for user jetflicks is the same on all servers" and on September 21, 2016, he told Dallmann, "[I]f sickrage can download the file don't worry I can handle ... don't worry when I finish with server s1001 I going to modify this script ...  you have the best programmer lol." GX  1601 lines 964-967 and 112.

Third, the government admitted numerous exhibits and expert testimony showing how Jetflicks operated when the defendant worked there including how it used SickRage

5

and SABnzbd to search for, download, process, and store infringing television episodes. For example, SickRage and SABnzbd were configured to go to specific torrent and NZB sites such as The Pirate Bay and altHUB in a certain order looking for specific television episodes, focusing in particular on episodes that had recently been aired. *See generally* ECF 631, Testimony of FBI SSA Poston. The filenames of the episodes and the websites themselves made numerous references to the fact that the episodes were pirated such as Amazon, Netflix, or Disney "web rips," "web downloads," "DVD rips," or "BluRays," along with credits to specific piracy release groups. For example, a device seized from one of Dallmann's residences revealed 28,856 downloaded television episodes and related files just during the period that the defendant worked as Jetflicks' computer programmer—that is, just from August 3, 2016 to December 10, 2016. GX 428. Other exhibits showed SickRage and SABnzbd searching for and downloading tens of thousands of infringing television episodes from pirate sites including thousands during this same period. GX 310. Printed SickRage show lists from the defendant's time at Jetflicks revealed the same. For example, a SickRage printout dated August 5, 2016 indicated that SickRage was searching for 788 television series and had downloaded 56,077 episodes, which was 11.7 percent of what it was searching for. GX 78.

Fourth, other exhibits showed that the defendant repopulated Jetflicks' entire database on five servers, allowing Jetflicks to "pretty much have all [the] content we've ever had...." GX 183 and 1622. According to Dallmann, "[W]orking with this programmer is awesome, he's the first person who thinks a lot like me, and is creative in his approach on how to fix things..." GX 183.

Fifth, other evidence showed that the defendant built a fake website for Jetflicks to help fool Stripe into thinking that the operation was involved in airline services rather than

illegal television streaming. On October 24, 2016, PayPal shut down Jetflicks' account for copyright infringement, which blocked the operation from getting payments from subscribers. GX 126. Dallmann had made over millions from Jetflicks at this point and this action by PayPal essentially crippled the business. GX 413. Apparently, PayPal had gone to the domain used for the streaming service, *jetflicks.mobi*, and seen that it was a piracy operation. As a result, Dallmann decided to run all subscriber payments for *jetflicks.mobi* through another website he owned, *jetflicks.com*. GX 1625. Dallmann opened a Wells Fargo account for Jetflicks claiming that his business was "in flight entertainment for private jets" and on November 3, 2016, he opened a new payment processing account for Jetflicks with Stripe using the domain *jetflicks.com*, claiming that his business was "Private and Corporate aviation entertainment system sales, service, and subscription services." GX 409 and 407A. However, Stripe was unable to verify Jetflicks' business when it visited *jetflicks.com* (it was password protected) and on November 9, 2016 froze the Jetflicks account. GX 134A. As a result, Dallmann and the defendant worked together to create a fake aviation services website at *jetflicks.com* to deceive Stripe so, as Dallmann put it, "[We] all get paid as soon as possible...:)." GX 179 and 137. While the defendant was finishing the fake website to defraud Stripe, Dallmann sent a lengthy email to Stripe that he also sent to the defendant (and which the defendant told Dallmann he read). GX 134 and 181. This email claimed that "[w]e have identified the problems faced by aircraft owners, and developed a hardware/software based solution....Our systems allow the passenger to use their mobile device to control [in flight entertainment], order drinks from the in-flight staff, communicate with the pilots, and even check flight status and statistics instantly." *Id.* He also informed Stripe that "we are about 75% done with the new site, but are still working on some functionality...." *Id.* When Dallmann checked with the defendant on the fake

7

website's progress, the defendant said that he was "building all from scratch" because he was "not using anything that is related to jetflicks.mobi." GX 180. On November 15, 2016—just six days after the Stripe shutdown—the defendant informed Dallmann that he had successfully purchased the first subscription for *jetflicks.mobi* through *jetflicks.com*. GX 1630. The next day, the defendant told Dallmann to "write to stripe and tell him jetflicks.com is working so they can pay us." GX 140. However, Dallmann remained worried that Stripe would not be convinced by the fake website and told the defendant that he was going to go to Wells Fargo in his $200,000 Viper to try to get a merchant account for Jetflicks and lie to the bankers there. GX 141. According to Dallmann, "[S]ince Jetflicks generates so much $ in previous years, it's basically free money for the banks for them to approve our account right on the spot..." *Id.* Stripe continued to do business with Jetflicks and unfroze the account.

Sixth, after the PayPal/Stripe episode, the relationship between Dallmann and the defendant soured. Dallmann worried that they had been making $20,000-$30,000 a month with PayPal and now were making less than $10,000 a month. GX 144. However, even though Jetflicks was now generating revenue again, the defendant complained about not being paid. *Id.* In response, Dallmann told him, "[Y]ou know the reasons why things went the way they did And you decided to stick with us through those issues... you can't throw that in my face at all." *Id.* After Dallmann stated that the defendant was not completing computer programming work for Jetflicks, the defendant told him, "You're threatening me and i'm not a boy, My contract with you ended a month ago exactly and we never renew it. So legally I have no commitment to you. I was helping them without compromise. I helped you for the friendship we had, and you owe me more than 5 thousand dollars. And I have

8

never accused you legally but if we are going to proceed in this way I will know what to do about this situation." GX 1633.

Seventh, other exhibits showed that the defendant was paid $8,170 during his almost 4.5 months with Jetflicks, and all of this money came from Dallmann's Bank of America account ending in 4488, the same account in which the Jetflicks PayPal subscription payments were deposited. GX 420 and 9038.

Eighth, FBI Special Agent Clay Chase testified that he interviewed the defendant in May 2018 about Jetflicks. The defendant told SA Chase that Jetflicks' business model was "Netflix for planes," which was obviously untrue when looked out in the context of all the evidence and was a similar cover story to the one that Dallmann used to defraud Wells Fargo and Stripe. ECF 623, at 76-77. The defendant also told SA Chase that Jetflicks' television episodes "came from DVDs that Kristopher Dallmann owned or rented." *Id.* at 77. This statement was clearly false as well since the evidence at trial clearly proved that the defendant knew that Jetflicks used SickRage and SABnzbd to go to torrent and NZB sites to download television episodes.

That evidence, plus the other testimony and exhibits admitted into evidence at trial by the government, clearly establishes that the defendant became a member of the Jetflicks conspiracy knowing of at least one of its objects and intended to help accomplish it; there was an agreement to engage in willful infringement of copyright; and the defendant acted for purposes of commercial advantage or private financial gain.

In response, the defendant claims that (1) all of the computers and servers seized were Dallmann's and not his; (2) he believed at the time that SickRage was just "a folder on the server" and not software; and (3) he did not have access to SickRage. Def.'s Motion, at 6-7. These arguments are irrelevant, nonsensical, and/or contradict the evidence.

Moreover, they hardly show dispositive proof that the defendant lacked knowledge and intent or that the jury's guilty verdict was a miscarriage of justice. In any event, after sitting through the entire trial and listening to and seeing all the evidence, the defendant testified under oath over two days and offered implausible explanations for all that testimony and evidence and his role at Jetflicks—and, repeatedly claimed that he did not know that Jetflicks was doing anything illegal. However, the jury obviously did not believe him. *See Shayota*, 784 Fed.Appx. at 991 (stating that "the jury was not required to credit [the defendant's] version of events over the testimony of other credible witnesses that tended to support her guilt").

In short, the government presented overwhelming evidence that the defendant worked with Dallmann to build the illegal Jetflicks streaming operation and hide its copyright infringement from Stripe, among others. The defendant woefully fails to meet his high burden to show that the evidence preponderates so heavily against the guilty verdict that the jury's decision was a miscarriage of justice.

### B. The Court Did Not Prevent The Defendant From Arguing That He Lacked Knowledge And Intent

Next, the defendant contends that the Court prevented him from arguing that he "was mistreated, abused, and stolen from while he worked at Jetflicks" and thus that he deserves a new trial. Def.'s Mot., at 8. However, at trial, the defense counsel conceded that the defendant's asserted defense was not duress but rather lack of knowledge and intent. The Court properly informed defense counsel that it could pursue that *mens rea* defense by suggesting that Dallmann lied to, deceived, or manipulated the defendant; he just could not cross the line to arguing that Dallmann "mistreated" or "abused" the defendant and turned him into a "wage slave." The Court ruled that any alleged mistreatment of the defendant

10

by Dallmann was just an improper bid to appeal to the jury's sympathy. The Court's ruling is not a basis for a new trial.

In defense counsel's opening statement, he attacked Dallmann. For example, defense counsel made the following accusations about Dallmann: "cruel," "absolutely abused [the defendant], victimized him, picked on him, stole his wages," "abus[ed] the man, taking advantage of the man," "screwing him over," "abusing an illegal immigrant who can't do anything," "won't pay him," "cruel," "laughing at Yoany behind his back about how hard he has to work," "taking advantage of a man who does not know what is happening," "commit[ting] wage theft," and "bullying." ECF, at 174-182. The government objected to this line of argument several times, and the Court sustained the objections.

First, an opening statement is supposed to be limited to what evidence will be presented, and not supposed to be an occasion for argument. Second, these arguments were obviously a gross exaggeration. For example, the evidence at trial showed that Dallmann paid the defendant $8,170 for his computer programming work; that he stopped paying the defendant after PayPal shut down the Jetflicks account for copyright infringement, which resulted in Dallmann and the defendant working together to set up a fake website at *jetflicks.com* to convince Stripe that Jetflicks was an aviation services business and resume the flow of money; during the conspiracy, the defendant told Dallmann "I love my work!!!" and called him his "best boss ever"; and shortly before the defendant left Jetflicks, he told Dallmann, "You're threatening me and i'm not a boy, My contract with you ended a month ago exactly and we never renew it. So legally I have no commitment to you. I was helping them without compromise. I helped you for the friendship we had, and you owe me more than 5 thousand dollars. And I have never accused you legally but if we are going to proceed in this way I will know what to do about this situation." GX 1601 lines 2933 and

11

1949 and 1633; DX 9038.  Third, given that the focus of the trial was on the defendant's knowledge and intent regarding copyright infringement and the defendant had not noticed or attempted to present a duress defense, assertions of cruelty, abuse, and wage theft were irrelevant.

After defense counsel's opening statement, the Court—outside of the presence of the jury—told him that the opening statement was "not proper" and "seeks to explicitly play upon the jury's sympathy on a matter that is irrelevant for their deliberation." ECF 615, at 184.  The Court went on to state, "I want you to avoid any term like 'wage theft,' 'abuse,' 'cruel,' 'cruelty,' right? You can certainly use terms like 'manipulation,' 'deception,' right? Those are appropriate in this case based upon your theory of defense.  But I don't want to hear any more words like 'abuse' or 'theft,' right, or him being picked on or targeted." *Id*. at 191.  However, the Court also said that, if defense counsel believed that there was a legal basis for such arguments, he was free to file something or otherwise raise it again. *Id.* at 190-91.

Subsequently, defense counsel brought up the issue again but did not suggest at trial or in a filing any legal basis for why the Court was incorrect.  ECF 617, at 20-32; ECF 618, at 68-90.  During this discussion, the Court noted that a defendant could raise a duress defense but had to give prior notice to the Court and government (which the defendant had not) and had to prove certain elements by a preponderance.  *Id.* at 25; ECF 618, at 68; *see also United States v. Vasquez-Landaver*, 527 F.3d 798, 802 (9th Cir. 2008) (stating that "We have long held that a defendant is not entitled to present a duress defense to the jury unless the defendant has made a prima facie showing of duress in a pre-trial offer of proof").  However, defense counsel stated that the defendant was not offering a duress defense.  ECF 617 at 25-26.  Moreover, he specifically conceded that his allegations of abuse or

mistreatment by Dallmann did not go to knowledge. As defense counsel stated, "I concede that at -- there is nothing I have that could reflect that he was so abused or mistreated that in that situation he couldn't have known. I have always known in this case, Your Honor. Always." ECF 618 at 74. The Court went on to state:

> Any suggestion, right, that he was being mistreated or abused, anything along those lines I find to be in violation of Rule 403 as being unfairly prejudicial and its probative value being outweighed by its unfair prejudice. So I don't want you to use those terms. I don't want to hear any terms related to wage theft; right? If you want to argue, again, that he didn't have the knowledge or that he was new to this country and so he didn't understand what he was doing, if you wanted to argue that he was being lied to by Mr. Dallmann as it relates to it being legal, all of those are fair arguments that you can raise. But you cannot raise these other types of arguments that make suggestions as it relates to abuse and mistreatment or him being targeted or laughed at. Whether or not they were laughing at him or not is irrelevant; right? It is not relevant to his knowledge; right? I don't see how that's relevant at all. So any reference to targeting, to, again, abusing, I will not permit that. If you want to say that he was being lied to, that's fine. But no words, terms, questions related to abuse, mistreatment, wage theft, being bullied, or targeting. Nothing like that.

Id. at 77-78

In his motion, the defendant does not mention any evidence that he wanted to introduce regarding Dallman's alleged abuse and mistreatment of the defendant other than GX 119, which was a proposed *government* exhibit. Def.'s Mot, at 2-5, 7-8. And, in fact, that seems to be the only proposed defense exhibit the Court declined to admit based on the defendant's mistreatment claim. ECF 618, at 80-90. Specifically, GX 119 involves an exchange between Dallmann and another person where Dallmann states that the defendant "loves to work" at Jetflicks; notes that "as long as [the defendant] can go out friday night with his friends, he's golden"; and then jokes, "[S]o i take off the shackles one night a week for him." Apparently, defense counsel sought to introduce this exhibit so that he could argue that Dallmann mistreated the defendant; as he put it, "Mr. Dallmann thinks it's funny

13

to shackle a man." ECF 618, at 85. The Court excluded the defendant from using the exhibit under Rule 403, finding that any unfair prejudice outweighed the probative value for which the defendant sought to use it. *Id.* at 82, 87-89. The Court also stated that the exhibit was irrelevant to the defendant's defense. *Id.* As the Court stated, "There's nothing about this particular message that speaks to Mr. Vaillant himself knowing or not knowing about copyright law. That is the crux of your case." *Id.* at 85.

The Court's ruling that GX 119 was irrelevant to the defendant's case and that its probative value to the defendant was substantially outweighed by a danger of unfair prejudice was not erroneous, let alone, a miscarriage of justice. That ruling is not a basis for a new trial.

### C. The Court Properly Instructed The Jury On Deliberate Ignorance

Finally, the defendant concedes that the Court's deliberate ignorance jury instruction was fine but claims that this instruction became "objectionable" when the Court "barred" the defendant from introducing evidence that he suffered "horrible treatment at the hands of Mr. Dallmann." Def.'s Mot, at 8.

First, other than GX 119, the defendant does not point to any exhibits or testimony that the Court "barred" showing Dallmann's "mistreatment." And GX 119 just demonstrates that the defendant worked very hard at Jetflicks and loved his work there. Dallmann's joke about "shackles" may not have been funny but it hardly demonstrates "horrible treatment." Moreover, the defendant's testimony under oath over two days at trial did not suggest that Dallmann mistreated him. While the defendant did testify that he was working 16 or 17 hours a day at Jetflicks, he never said that Dallmann forced him to work those hours. ECF 632, at 180. In fact, at least during his earlier time at Jetflicks, the defendant stated that he loved his work and that Dallmann was the best boss that he had

14

ever had. GX 1601 lines 2933 and 1949. Moreover, at trial, the defendant testified that Dallmann gave him a television and Roku, and sold him a BMW. ECF 635, at 39; ECF 632, at 197.

Second, the Court's ruling on the admission of GX 119 does not make the deliberate ignorance instruction inappropriate. Deliberate ignorance is just another way to establish knowledge and intent; it does not become "inappropriate" because the Court excluded a single defense exhibit. *See Anderson*, 741 F.3d at 948 (stating that "willful blindness theories . . . are valid theories for satisfying the intent element" under 17 U.S.C. § 506(a)(1)(A)). A defendant's "actions could be willful even if [he] only knew that the copying 'may be illegal' but did not know that it was to a certainty." *Id.*

An instruction on deliberate ignorance is appropriate where a defendant claims to have no positive knowledge of illegal activity, but the evidence shows that he deliberately chose to avoid learning of the illicit nature of his acts. *United States v. Jewell*, 532 F.2d 697, 703-04 (9th Cir. 1976) (en banc); *Shayota*, 784 Fed.Appx. at 990 (holding that deliberate ignorance instruction was proper where "[d]espite their exposure to numerous suspicious aspects of the scheme, the Shayotas continued to participate," selling counterfeit goods to distributors and retailers around the country). Deliberate ignorance contains two prongs: (1) a subjective belief that there is a high probability a fact exists; and (2) deliberate actions taken to avoid learning the truth. *United States v. Yi*, 704 F.3d 800, 804-05 (9th Cir. 2013) (citing *Global-Tech Appliance, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).

First, the defendant testified that he was Jetflicks' computer programmer and had 12 years of computer programming experience when he started there (his resume stated that he had 15 years of such experience) but claimed that he did not have any access to any computers at Jetflicks including virtual access; did not know where Jetflicks' servers were

located; did not use Macintosh computers and never had access to a Macintosh computer; did not know that SickRage was software and thought it was just a "server with a folder inside with tens of thousands of TV shows"; did not have access to the SickRage software or the SickRage APIs; was never able to get the Roku that Dallmann gave him to work; did not know what SABnzbd was; thought that *jetflicks.mobi* had a banner of planes; believed that Jetflicks was an aviation company; and thought that Jetflicks' content came from DVDs that Dallmann purchased or rented.  ECF 632, at 202-203 231-235; ECF 635, at 16-32, 39, 48-49, 66-67.  All those statements contradict evidence in the case.  Moreover, apart from the fact that the defendant repeatedly and brazenly lied under oath, the defendant's position at Jetflicks and his exceptional computer programming expertise and experience alone support an inference that he was aware of the high probability that Jetflicks was engaged in copyright infringement.  *See Yi*, 704 F.3d (holding that Yi's 16-year-experience in property management supports an inference that he was aware of a high probability that the ceilings in a particular building contained asbestos).

Second, the defendant testified implausibly that he did not know that SickRage was software, did not access it, or understand how it worked until he heard the testimony and saw the exhibits at trial in November 2024—even though (1) the defendant was indicted in August 2019 and the indictment discussed SickRage 19 times and (2) he and Dallmann exchanged 7,718 text messages from July 29, 2016 to December 20, 2016, referring to SickRage approximately 262 times.  GX 1601; ECF 618, at 28.  The jury could infer from this that, if the defendant truly did not know that Jetflicks was using SickRage to obtain infringing television episodes until the trial in November 2024—even though he and Dallmann repeatedly discussed using SickRage to search for, download, process, and store infringing television episodes in 2016—he took deliberate actions to avoid learning the

truth. *See Yi*, 704 F.3d at 805 (jury could infer that defendant with 16 years of experience with property management, who claimed that he was very busy and did not need to read documents common to real estate transactions, had deliberately avoided learning the truth about whether a building's ceilings contained asbestos).

In sum, the Court's deliberate ignorance instruction did not become "objectionable" because the Court declined to allow the defendant to admit a proposed government exhibit or told the defense counsel that he could not argue—without at least providing legal justification—that Dallmann "abused" and "mistreated" the defendant.[1]

## IV.   Conclusion

The overwhelming evidence of the defendant's guilt presented at trial confirms that this case is not an "exceptional" circumstance where "a serious miscarriage of justice may have occurred." *Pimentel*, 654 F.2d at 545.  For the reasons stated above, the United States respectfully requests that the Court enter an order denying the defendant's motion.

---

[1] The defendant notes that the government used "elements" and "facts" interchangeably a few times during closing argument. Def.'s Motion, at 2 and 4.  The Court intervened *sua sponte* twice to direct the government to refer to stipulations of facts, not elements. ECF 635, at 126 and 159. Subsequently, the Court then issued a curative instruction clarifying that "the parties have agreed to stipulations of fact.  It is for you to decide whether or not the Government's proven its case beyond a reasonable doubt as to each and every one of the elements, right.  The parties have not and cannot stipulate to the elements.  They can stipulate to facts which you can use to decide whether or not the elements of a crime have been satisfied." ECF 635, at 196.  It not clear that there is any relevant difference between a fact and element.  *See, e.g.*, *United States v. O'Brien*, 560 U.S. 218, 227 (2010) (stating that "certain facts constitute elements" of offenses); *Jones v. United States*, 526 U.S. 227, 232 (1999) (stating that "a fact is an element of an offense..."  But, in any event, the Court's interventions and curative instruction obviated any confusion about the stipulations or possible prejudice to the defendant.  *See United States v. Brady*, 579 F.2d 1121, 1127 (9th Cir. 1978) (stating that the juries are presumed to follow curative instructions).  And there was ample independent evidence upon which the jury could rely to find the defendant guilty.  *United States v. Nelson*, 137 F.3d 1094, 1106 (9th Cir. 1998).

Respectfully submitted this 11th day of December 2024.

        NICOLE M. ARGENTIERI
        Principal Deputy Assistant Attorney General
        Head of the Criminal Division

        */s/ Matthew A. Lamberti*
        MATTHEW LAMBERTI
        Senior Counsel
        MICHAEL CHRISTIN
        Trial Attorney
        United States Department of Justice

        JASON M. FRIERSON
        United States Attorney

        */s/ Jessica Oliva*
        JESSICA OLIVA
        Assistant United States Attorney